UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                Case No.: 2:22-cr-20427
v.                               Hon. Gershwin A. Drain


HERSHEL MARION,

        Defendant.

_____/

**<u>OPINION AND ORDER DENYING DEFENDANT'S AMENDED MOTION
FOR RECONSIDERATION [ECF No. 69]</u>**

Defendant Hershel Marion is charged with conspiracy to possess with intent to distribute controlled substances and conspiracy to distribute controlled substances under 21 U.S.C. §§ 846 and 841(a)(1), two counts of distribution of a controlled substance resulting in death under 21 U.S.C. § 841(a)(1), maintaining a drug premises under 21 U.S.C. § 856(a)(1), and unlawful use of a communication facility under 21 U.S.C. § 843(b). Presently before the Court is Defendant's amended motion for reconsideration, which seeks reconsideration of the Court's order on Defendant's motion to dismiss.[1] Defendant argues that the Government violated his speedy trial

---

[1] The Court is treating this motion for reconsideration as if it were a stand-alone motion to dismiss. *See* ECF No. 103, PageID.828–29.

rights under 18 U.S.C. § 3161(b) and Fifth Amendment right to due process. The government opposes the motion.

The Court held an evidentiary hearing on January 14, 2026, and both parties submitted supplemental briefs thereafter. Considering the evidence and arguments of the parties, Defendant's amended motion for reconsideration [ECF No. 69] is DENIED.

## I.     BACKGROUND

### a.  The Federal Case

According to the Government's allegations, Defendant Hershel Marion was involved in the "Backstreets" gang which operated a territory in Detroit, Michigan. ECF No. 71, PageID.602. Over a multi-year investigation beginning in 2017, federal investigators learned that Defendant was a "top dog" narcotics distributor within the Backstreets territory and operated a drug house on Exeter Street, where individuals could buy cocaine, crack cocaine, heroin, and fentanyl. *Id.* at PageID.602–03. The Federal Bureau of Investigation ("FBI") installed a pole camera near the Exeter house in August 2017 and interviewed individuals who frequented the house and purchased drugs there. ECF No. 120, PageID.977. FBI informants also conducted several undercover drug buys from Defendant. ECF No. 71, PageID.603. In March 2018, federal investigators began intercepting Defendant's wire and electronic

2

communications, which captured Defendant's communications directing the sale of crack cocaine and heroin from the Exeter house. *Id.* at PageID.603–04.

The FBI also learned of three overdoses linked to Defendant's drugs that occurred in July 2018, October 2018, and May 2019, respectively. Two victims died from their overdoses, and one survived. *Id.* at PageID.604. In addition, federal investigators assisted the Detroit Police Department ("DPD") in investigating a homicide that they believed was related to a robbery that occurred at the Exeter house. ECF No. 120, PageID.978. Investigators suspected that Defendant may have helped relocate the body of the homicide victim. *Id.*

The FBI continued their investigation of Defendant through 2022. On August 17, 2022, a federal grand jury indicted Defendant for conspiracy to possess with intent to distribute controlled substances and conspiracy to distribute controlled substances, distribution of controlled substances resulting in death, maintaining a drug premises, and unlawful use of a communication facility. ECF No. 1. On October 5, 2022, a federal grand jury indicted Defendant for another count of distribution of controlled substances resulting in death. ECF No. 24. Defendant was arrested on these charges in August 2022 and remains detained pending trial.

### b. The State Parole Violations

Although Defendant was not arrested on the federal charges until August 2022, he was incarcerated for state parole violations from May 23, 2019 to June 28,

2022. ECF No. 120, PageID.979, 983. It is Defendant's detention for these violations that form the basis of Defendant's speedy trial and due process concerns underlying the instant motion.

Defendant began a term of parole in 2016 which was scheduled to terminate in December 2017, but was extended to June 2019 due to parole violations. ECF No. 71, PageID.604; ECF No. 71-2. Thus, Defendant was on parole during the entirety of the FBI investigation of the Backstreets gang. Defendant's parole officer was Ryan Morant. Morant served as a parole officer for the Michigan Department of Corrections ("MDOC") and also as an FBI liaison to the Violent Gangs Taskforce, which was comprised of several law enforcement agencies including the FBI. ECF No. 116, PageID.883.

On May 17, 2019, Morant emailed his supervisors, Charles Page and Latrelle Pickens. *See* ECF No. 120-2. Morant informed his supervisors about the FBI's investigation of Defendant and stated that Defendant "has been marked a number one priority to take off the streets by the FBI and DPD." *Id.* He further stated that the FBI agent on Defendant's case "asked that MDOC take custody of the parolee until the federal charges of supplying fentanyl laced heroin causing death can be submitted to the United States Attorney [sic] Office." *Id.* Morant told his supervisors that Defendant had multiple violations he could be held on and that he planned to arrest Defendant on his report day for assaulting the mother of his child ("CW"), for

4

positive cocaine SATs, and for missing substance abuse treatment. *Id.*[2] Morant

concluded by asking:

> If a search warrant is executed early next week at the parolees [sic] approved residence and he is there can we hold him for the FBI until the federal charges are ready? I would expect this to take no longer than 30 days and they would have the US Marshals writ him from MDOC custody.

*Id.*

Pickens responded, stating that MDOC cannot hold an offender arbitrarily but

that "[i]f we have violations that you want to process then we can do that." ECF No.

123-4, PageID.1063. Pickens also stated that if there were no current parole

violations to hold Defendant for, they could only hold him for 10 days in order to do

an investigation. *Id.* Morant replied and confirmed his intent to charge Defendant

with parole violations. *Id.* At the evidentiary hearing, Morant testified that MDOC

would have prosecuted Defendant for his parole violations regardless of what the

federal government decided to do regarding Defendant's federal indictment. ECF

No. 116, PageID.918.

Morant arrested Defendant on May 23, 2019 for the following violations: (1)

he violated state/federal law by possessing cocaine on March 1, 2018; (2) he

possessed cocaine on March 1, 2018; (3) he violated state/federal law by possessing

---

[2] Of these purported violations, the only one Defendant was ultimately charged with was the alleged assault of CW.

heroin on March 1, 2018; (4) he possessed heroin on March 1, 2018; (5) he engaged in assaultive, abusive, threatening, or intimidating conduct when he physically assaulted CW on May 8, 2019; (6) he violated a special condition of parole by having contact with CW on May 8, 2019; (7) he violated a special condition of parole by driving without permission on May 14, 2019; and (8) he possessed ammunition on May 8, 2019. ECF No. 120-7, PageID.1003.

On May 30, 2019, Morant emailed Page, stating that FBI Special Agent Ted Brzezinski expected a federal warrant and writ to be issued for Defendant within 45 days. ECF No. 120-4, PageID.997. Page responded, saying "This is not what was said at the beginning if I am correct? / 10 days before a warrant. I do not want outside continuing to use MDOC as a lock up. They have to be clear and everyone more straight up." *Id.* Morant replied that Defendant was being held for parole violations and was not being held arbitrarily (and therefore was not subject to the 10-day limitation), and that "DPD / FBI higher ups wanted him off the street ASAP." *Id.* Morant informed Page that Defendant "has [a] violation unrelated to the long term drug investigation that he can be held on," *id.*, referring to the assault of CW.

Procedurally, MDOC began the parole revocation process. In accordance with its policies, MDOC set Defendant's preliminary hearing within 10 days of his arrest. ECF No. 116, PageID.908. Defendant decided to waive that hearing. *Id.* at PageID.909. Then, consistent with its policies, MDOC set the full parole revocation

hearing within 45 days of Defendant's arrest. *Id.* Defendant requested an adjournment and did not seek to come out of adjournment until August 19, 2019. *Id.* at PageID.910. The parole hearing was then rescheduled for October 8, 2019, within the renewed 45-day window for holding it. *Id.*

However, on that day, Heather Stevens, the MDOC parole hearing specialist, decided to dismiss all the charges against Defendant[3] because federal authorities had not yet released evidence to MDOC for the hearing and CW failed to appear to testify against Defendant on the assault charge.[4] ECF No. 120, PageID.982. Stevens informed Defendant that MDOC would be re-serving him with new parole violation counts and that he would not be released in the interim because she was, in essence, re-arresting him immediately. ECF No. 120-9; ECF No. 116, PageID.948. Stevens refiled the parole violation charges and Defendant was re-served the following day. ECF No. 116, PageID.940. Another 45-day clock began for holding the new parole violation hearing. *Id.* at PageID.939.

---

[3] At the evidentiary hearing, Stevens explained that she had initially sought only to adjourn the case, but Defendant elected to have the case dismissed and refiled rather than adjourn it. ECF No. 116, PageID.946–47.

[4] In Defendant's supplemental brief, he references additional evidence that was not provided at the evidentiary hearing. The evidence, including a police report, suggests that CW may have been the aggressor in the assault scenario. ECF No. 120, PageID.981.

The new violation charges against Defendant were as follows: (1) he violated state/federal law by possessing cocaine on March 1, 2018; (2) he possessed cocaine on March 1, 2018; (3) he violated a special condition of parole by having contact with CW; (4) he violated a special condition of parole by driving without permission on May 14, 2019; (5) he possessed ammunition on May 23, 2019; (6) he violated state/federal law by possessing fentanyl on March 1, 2018; (7) he possessed fentanyl on March 1, 2018; (8) he associated with John Howard, knowing he had felony convictions; (9) he knowingly associated with John Howard who was involved in behavior constituting a violation of state/federal law; (10) he violated state/federal law when he was involved in the distribution of heroin; (11) he engaged in assaultive, abusive, threatening, or intimidating conduct when he physically assaulted CW on May 8, 2019. ECF No. 69-6, PageID.578.

On October 15, 2019, MDOC held a preliminary hearing at which the administrative law examiner ("ALE") dismissed the counts related to CW (counts 3 and 11), as CW had failed to appear and testify. ECF No. 123, PageID.1047. The ALE also dismissed count 8. ECF No. 120, PageID.983. However, FBI Agent Brzezinski testified as to the remaining counts, and the ALE found probable cause. ECF No. 123, PageID.1047. At the full parole revocation hearing on November 19, 2019, the ALE determined that Defendant was acting in concert with John Howard to sell controlled substances on or about March 1, 2018, and therefore found

8

Defendant guilty of counts 2, 7, and 9. ECF No. 69-6, PageID.582. The ALE also found that Defendant had driven a motor vehicle without permission and was guilty of count 4. *Id.* The ALE dismissed counts 1 and 6 as duplicative of other counts and dismissed counts 5 and 10 for lack of evidence. *Id.* at PageID.580, 582–83.

Defendant was sentenced to 24 months in prison for the parole violations and was re-paroled on June 28, 2022. ECF No. 116, PageID.916. Two months later, a federal grand jury indicted Defendant for the federal crimes in the instant case.

### c.  The Instant Motion

On August 13, 2024, Defendant filed a *pro se* motion to dismiss the indictment and for an evidentiary hearing on the same. *See* ECF No. 61. Defendant argued that federal authorities colluded with MDOC officials and used MDOC as a tool to arrest and detain Defendant while they completed their investigation of him. Through MDOC, Defendant argues, the federal government evaded the strictures of the Speedy Trial Act, which requires that an information or indictment against an individual be filed within 30 days from the date that the individual was arrested. *Id.* at PageID.480–81. The Court denied this motion because Defendant had filed it *pro se* while also having assigned counsel. ECF No. 64, PageID.493. The Court also posited that Defendant's motion would be denied on the merits anyway, because the speedy trial clock does not begin until a federal indictment has issued, and in this case, the indictment was not issued until August 17, 2022. *Id.* at PageID.494.

9

Through counsel, Defendant filed a motion for reconsideration. ECF No. 69. Defendant's motion for reconsideration reasserts the same arguments but with more factual detail and adds a due process argument under the Fifth Amendment. Specifically, although Defendant acknowledges that the speedy trial clock typically does not begin to run until a federal arrest, the "ruse" exception applies where a state arrest is used as a device to restrain a defendant until the federal government chooses to prosecute, and "the time the defendant spends in state custody can be included in the calculation of time under the Federal Speedy Trial Act." *Id.* at PageID.546. Defendant also argues that the Government's pre-indictment delay of several years prejudices his defense and therefore violates his due process rights. *Id.* at PageID.551–53.[5] With Defendant's arguments expanded and explained in more detail through defense counsel, the Court concluded that an evidentiary hearing was necessary on this issue and ordered a hearing. ECF No. 75.

The Court held an evidentiary hearing on January 14, 2026, at which Morant, Stevens, and Brzezinski testified. Both parties have filed supplemental briefs following the hearing. The issue is now ripe for adjudication.

---

[5] Notably, the Court entered an order stating that it considers this motion as a newly filed motion to dismiss, separate from Defendant's initial *pro se* motion, and therefore free from the procedural restrictions on motions for reconsideration under Local Rule 7.1(h). *See* ECF No. 103, PageID.828–29. The Court also declined to apply the law of the case doctrine to deny the new motion. *Id.* at PageID.829.

## II.      LEGAL STANDARD

Motions to dismiss indictments are governed by Rule 12 of the Federal Rules of Criminal Procedure, which states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "District courts are directed to dispose of all motions before trial if they are capable of determination without trial of the general issue." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). A district court may dispose of a pretrial motion to dismiss if it involves questions of law instead of fact, or if it involves questions of fact that "do not invade the province of the ultimate factfinder" regarding the facts underlying the charges. *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997). Thus, "a defense is capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Jones*, 542 F.2d at 665 (internal quotation marks omitted).

## III.      DISCUSSION

### a. Speedy Trial Act

The Sixth Amendment to the U.S. Constitution provides that a criminal defendant "shall enjoy the right to a speedy and public trial." U.S. Const. amend VI. The right to a speedy trial is codified in the Speedy Trial Act, which sets time limits on how long a criminal prosecution may take. *See* 18 U.S.C. § 3161 *et seq.* Relevant

11

here, the Speedy Trial Act provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b).

Notably, "only federal arrest, as distinct from state arrest, triggers the protections of the Speedy Trial Act." *United States v. Copley*, 774 F.2d 728, 730 (6th Cir. 1985). "To define a federal arrest for purposes of the Speedy Trial Act, courts have held uniformly that 'one was not arrested within the intendment of the Speedy Trial Act until he be taken into custody after a federal arrest for the purposes of responding to a federal charge." *Id.* (quoting *United States v. Iaquinta*, 674 F.2d 260, 266 (4th Cir. 1982)). This is true "even if federal officials cooperated with the state police in investigating the defendant." *United States v. Hinojosa*, 67 F.4th 334, 340 (6th Cir. 2023). It is also true even if the defendant is detained for a state offense that is related to or based on the same underlying conduct as the federal offense. *See id.*

However, "where a state arrest and detention are used as a device to restrain a defendant until the federal authorities choose to prosecute, the time the defendant spends in state custody can be included in the calculation of time under the Federal Speedy Trial Act." *United States v. Gaines*, 105 F. App'x 682, 687–88 (6th Cir. 2004), *vacated and remanded on other grounds*, *Gaines v. United States*, 543 U.S. 1114 (2005). In other words, a state arrest and detention may be counted in the

12

speedy trial timer where the state arrest is "a mere ruse to avoid application of the Speedy Trial Act." *United States v. Garcia-Echaverria*, 374 F.3d 440, 451 (6th Cir. 2004); *see also United States v. Pasillas-Castanon*, 525 F.3d 994, 997 (10th Cir. 2008) ("While civil arrests and detentions do not ordinarily trigger the Speedy Trial Act, they may activate it when law enforcement authorities collude with state or civil officials to detain a defendant as a mere ruse for later prosecution.").[6]

The majority of circuits that recognize the ruse exception have held that it only applies when the "*primary or exclusive purpose*" of a detention is "to hold the defendant for future criminal prosecution." *Pasillas-Castanon*, 525 F.3d at 998 (collecting cases from the Third Circuit, Eleventh Circuit, Fifth Circuit, and First

---

[6] The Sixth Circuit has not officially recognized the ruse exception, although it has expressed tacit approval of it. For example, while the Sixth Circuit indicated a willingness to recognize such an exception in *Gaines*, *Gaines* is unpublished, and the court found that the exception did not apply under the circumstances. *Gaines*, 105 F. App'x at 687–88. In *Garcia-Echaverria*, the Sixth Circuit assumed for the sake of argument that such an exception exists (in the immigration/deportation context), but found that even if it did, it would not apply. *Garcia-Echaverria*, 374 F.3d at 451, 451 n.15. In *United States v. Jemison*, another unpublished case, the Sixth Circuit addressed the defendant's ruse argument but found that it was not applicable under the circumstances. 310 F. App'x 866, 873 (6th Cir. 2009). Notably, however, there are grave reasons to doubt the wisdom and viability of the ruse exception, as the Third Circuit cogently explained in *United States v. Hopkins*. *See United States v. Hopkins*, 106 F.4th 280 (3d Cir. 2024) (rejecting the ruse exception as inconsistent with the text of the Speedy Trial Act, inconsistent with principles of federalism and dual sovereignty, a hinderance to prosecutorial discretion, and a hinderance to law enforcement collaboration). However, the Court does not address these legal and practical problems here, because even if the ruse exception is applied, Defendant's argument fails.

Circuit) (emphasis in original).[7] "The mere fact that the detaining authorities are aware other potential criminal charges are available does not trigger the exception." *Id.* "Without evidence of wrongful collusion… the exception does not apply." *Id.* "In short, if the detaining authorities have a lawful basis for their civil detention, a defendant is not entitled to invoke the exception." *Id.*

### i.    The Ruse Exception Is Inapplicable

Defendant argues that the evidence in this case demonstrates that federal and state authorities wrongfully colluded to detain him while the federal government continued its investigation of him. Defendant points to several pieces of evidence and testimony for this conclusion. Defendant notes that Morant's own email to Pickens and Page stated that the FBI asked MDOC to take custody of Defendant until federal charges were filed. *See* ECF No. 120-2, PageID.993. Defendant also points out that Morant had been aware of many parole violations prior to arresting Defendant in 2019, yet did not arrest Defendant for any of those violations until the

---

[7] The Sixth Circuit has not established a definite standard to govern this inquiry. In *Gaines*, the Sixth Circuit did not discuss a test to apply when determining whether the ruse exception is applicable. *Gaines*, 105 F. App'x at 688–89. In *Garcia-Echaverria*, the Sixth Circuit noted that most circuits apply the "primary and exclusive purpose" test, but it did not apply it. *Garcia-Echaverria*, 374 F.3d at 451. In *Jemison*, the Sixth Circuit held that there was "no evidence to suggest that the prosecution was manipulating the system to avoid compliance with the Speedy Trial Act," and concluded that the district court did not err in denying the defendant's speedy trial motion. *Jemison*, 310 F. App'x at 873. It is not clear from the opinion what "manipulating the system" entails or how it should be measured.

FBI asked him to do so. ECF No. 120, PageID.986. Defendant notes that most of the parole violations lodged against him were based on the federal investigation, and the violations pertaining to the alleged assault of CW were largely baseless. *Id.* at PageID.987.

The Government counters that the ruse exception cannot apply here because Defendant was a MDOC parolee at the time of his arrest, and still technically in custody of the state, regardless of the federal investigation. ECF No. 123, PageID.1050–51. In any event, the Government argues that there is no evidence of wrongful collusion. The Government maintains that the information sharing that occurred between the FBI and MDOC was commonplace and good police work. *Id.* at PageID.1051. Moreover, the Government asserts that MDOC followed all internal processes in adjudicating Defendant's parole violations, which is evidence of MDOC's good faith. *Id.* The Government also points out that the MDOC witnesses, Morant and Stevens, testified that Defendant would have been prosecuted for his parole violations regardless of the outcome of the federal case against Defendant. *Id.* at PageID.1051–52. Finally, the Government notes that Defendant was released two months prior to the federal indictment, arguing that this is further evidence that Defendant was not held for the Government to obtain an indictment. *Id.* at PageID.1052.

15

The Court concludes that the ruse exception does not apply. Certainly, the evidence demonstrates that federal and state authorities collaborated and coordinated for the purpose of prosecuting Defendant's parole violations. Morant himself served on the Violent Gangs Taskforce with the FBI and other law enforcement agencies while he was a parole officer with MDOC. ECF No. 116, PageID.883. He liaised with the FBI regularly when the subject of an FBI investigation was an MDOC parolee. *Id.* at PageID.897. As such, Morant and Brzezinski communicated about Defendant's parole violations relating to the FBI investigation. *See* ECF No. 120-2; ECF No. 116, PageID.954–55. Brzezinski also testified at Defendant's parole revocation hearing and provided evidence in support of Defendant's parole violations. ECF No. 116, PageID.957–58.

However, "communication and even coordination between the state and federal prosecutors does not itself compel the conclusion that the federal prosecutors were using the state prosecution as a ruse." *United States v. Triplett*, 158 F. App'x 768, 770 (9th Cir. 2005). Morant testified that he frequently receives information from state and federal law enforcement about parolees and that he necessarily must rely on such information to file violations against parolees. ECF No. 116, PageID.898. Outside law enforcement agencies must also provide MDOC with discovery and even testify at parole hearings to establish those parole violations. *Id.* "Joint state and federal investigations are the norm, and extensive discussion back

16

and forth between state and federal authorities is not uncommon." *United States v. Alvarado-Linares*, 698 F. App'x 969, 974 (11th Cir. 2017). Accordingly, the FBI and MDOC collaboration in this case does not support Defendant's ruse argument.

To be sure, Morant's email to Pickens and Page stating that the FBI had "asked that MDOC take custody" of Defendant pending the filing of federal charges would seem at first blush to be strong evidence of wrongful collusion for the purpose of avoiding the Speedy Trial Act. *See* ECF No. 123-4, PageID.1064. However, upon considering the broader context, it is clear that Morant's statement was simply poorly worded. Morant's supervisor, Pickens, was also alarmed by the wording in Morant's email, and reminded him that "we can't just hold the offender arbitrarily. If we have violations that you want to process then we can do that." *Id.* at PageID.1063. In response, Morant assured Pickens that he planned to charge Defendant with multiple violations, including several that were unrelated to the federal investigation. *Id.* In a later email with Page, Morant confirmed that MDOC was holding Defendant for parole violations, not simply as a "lock up" for federal authorities. ECF No. 120-4, PageID.997. At the evidentiary hearing, Brzezinski stated that he never instructed MDOC to detain Defendant, but rather gave MDOC information from the FBI investigation and simply authorized the use of that information for a parole violation petition. ECF No. 116, PageID.958.

17

Moreover, both Morant and Stevens confirmed during their testimony at the evidentiary hearing that they intended to prosecute Defendant for his parole violations regardless of the outcome of the federal investigation and prosecution. ECF No. 116, PageID.918, 949. Their testimony is supported by the actual outcome in the parole violation case: even though the federal government did not secure an indictment within 30–45 days as Brzezinski had hoped, MDOC fully prosecuted Defendant for his parole violations in compliance with its own policies and procedures, detained Defendant after he was found guilty of those violations by a neutral ALE, and released Defendant in June 2022 after he served his time—all before a federal indictment was ever issued. *See Pasillas-Castanon*, 525 F.3d at 998 (finding that when the detaining authorities follow their own policies and procedures when prosecuting a defendant, it is evidence that detention is not a ruse).

In short, MDOC "had a legitimate and independent reason to detain [Defendant.]" *United States v. Mearis*, 36 F.4th 649, 654 (5th Cir. 2022); *see also Triplett*, 158 F. App'x at 770. "[T]here is no evidence to suggest that [MDOC] would not have prosecuted [Defendant] had the federal authorities ultimately decided not to." *Triplett*, 158 F. App'x at 770–71. Rather, the evidence suggests that MDOC used its independent prosecutorial discretion to charge Defendant with violations based on the information from the FBI investigation and for other violations, as well. Thus, while "there is evidence to suggest coordination between state and federal

officials," the record fails to show collusion sufficient to trigger the ruse exception. *Id.* at 771; *see also Pasillas-Castanon*, 525 F.3d at 998 ("[I]f the detaining authorities have a *lawful basis for their… detention*, a defendant is not entitled to invoke the [ruse] exception." (emphasis added)); *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994) (finding that the district court did not abuse its discretion by rejecting ruse exception where the state attorney indicated the state's intent "to proceed with its prosecution if the federal authorities did not file charges.").

Defendant notes that Morant had been aware of multiple parole violations that Defendant committed prior to May 2019, but Morant failed to file charges against Defendant for any of those violations until he spoke with Brzezinski about the overdoses at the Exeter house. ECF No. 120, PageID.986–87. Defendant argues that this is evidence that MDOC did not detain Defendant for any other reason except to hold him for a federal indictment. *Id.* But as Morant explained at the evidentiary hearing, the FBI was unwilling to release any evidence to Morant to support Defendant's parole violations prior to May 2019. ECF No. 116, PageID.904–05. Once the FBI authorized such release in May 2019, Morant decided to move forward with the violations. *Id.* That does not indicate wrongful collusion—it simply indicates that the FBI and the MDOC engaged in information sharing. The fact that the agencies shared information does not detract from the fact that MDOC had a lawful basis to arrest and detain Defendant. *See Pasillas-Castanon*, 525 F.3d at 998.

19

In any event, Morant also arrested Defendant for assaulting CW, which was entirely independent of the federal investigation. ECF No. 116, PageID.902. Defendant argues that the charges relating to CW were baseless because the police incident report suggested that she was the aggressor. ECF No. 120, PageID.981. However, Morant testified that CW visited his office and wrote out a statement detailing the alleged assault against her. ECF No. 116, PageID.902; *see also* ECF No. 123-3 (CW's witness statement). Morant also testified that CW had bruising and injury to her face, consistent with being assaulted. *Id.* In other words, far from being baseless, there were questions of fact surrounding the assault. And, as Morant explained, he needed to file a violation petition for that conduct because, if true, it constituted assaultive behavior by a parolee. *Id.* Although the charges relating to CW were ultimately dismissed because she failed to appear as a witness, they further demonstrate that Morant had a completely independent reason for the initial arrest of Defendant.

Given that the ruse exception does not apply, there is no speedy trial violation under 18 U.S.C. § 3161(b) because Defendant was arrested on the federal indictment after it issued in August of 2022. *See Hinojosa*, 67 F.4th at 339. Therefore, Defendant's speedy trial claim fails.

**b. The Due Process Clause of the Fifth Amendment**

The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving a person of liberty without due process of law. *See* U.S. Const. amend V; *United States v. Harvel*, 115 F.4th 714, 728 (6th Cir. 2024). In the context of criminal proceedings, "this due-process right has a narrow role to play[.]" *Harvel*, 115 F.4th at 728. It only protects against government actions that violate "fundamental conceptions of justice which lie at the base of our civil and political institutions." *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). The Supreme Court has recognized that the due process clause may play a role, albeit a "limited" one, in protecting against "oppressive" pre-indictment delay. *See id.* at 789.

In the Sixth Circuit, to establish that a pre-indictment delay violated the due process clause, a defendant "must meet… a 'nearly insurmountable' burden." *Harvel*, 115 F.4th at 728 (quoting *United States v. Rogers*, 118 F.3d 466, 477 n.10 (6th Cir. 1997)). First, a defendant must prove that "the delay caused concrete prejudice to the defense." *Id.* (citing *United States v. Schaffer*, 586 F.3d 414, 424–25 (6th Cir. 2009); *United States v. Duncan*, 763 F.2d 220, 222 (6th Cir. 1985)). Second, the defendant must prove that "the government engaged in the delay with the bad-faith motive 'to gain a tactical advantage' in the litigation." *Id.* (quoting *Schaffer*, 586 F.3d at 424; *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992)).

21

i.      Defendant's Due Process Rights Were Not Violated

Defendant argues that the Government engaged in excessive pre-indictment delay by waiting until August 2022 to indict him. Defendant argues that his defense was prejudiced because one witness, CM, has since passed away. ECF No. 120, PageID.988. CM's testimony would have been that she and another individual operated the Exeter house at Defendant's direction, and she would have explained the ledgers she maintained regarding drug sales. *Id.* Additionally, Defendant argues that many of the informants used in the FBI investigation were addicted to hard drugs, so their memories may be faulty. *Id.* at PageID.988–89; ECF No. 121, PageID.1033. Defendant also claims that three months of pole camera footage of the Exeter house, spanning from November 22, 2018 through February 18, 2019, has been irreparably corrupted. ECF No. 121, PageID.1030. Defendant further claims that some of the Government's other evidence has been degraded or lost. For example, Defendant notes that one of the FBI's internal drives—which contains some of the pole camera footage—has 1.81 terabytes of total space and 864 gigabytes of unused space. Defendant postulates that this drive should be nearly full if it were truly continuously recording, "strongly suggest[ing] that the copy is incomplete or that significant portions of the original data were never captured during the duplication process." *Id.* at PageID.1031. Additionally, Defendant notes that the only external drive in his possession was not created by the FBI or

22

Government, but instead was converted from the FBI's internal drive by Defendant's prior counsel, which risked "degradation" of the evidence. *Id.* at PageID.1031–32.

Aside from prejudice, Defendant argues that the Government intentionally engaged in the delay to gain a tactical advantage in this case. Defendant notes that several other indictments related to the FBI's "Backstreets" investigation occurred in 2018 and 2019, yet Defendant's indictment did not occur until 2022—after Defendant had been forced to go through parole revocation proceedings which may now be used against him. ECF No. 120, PageID.989–90. Defendant also points out that MDOC's parole report for Defendant states that there was a "pending federal indictment" being reviewed by the United States Attorney's Office, even though there was no indictment pending at that time. ECF No. 121, PageID.1034. Defendant concludes from this fact that the Government used a false representation to MDOC to secure Defendant's detention. *Id.*[8]

---

[8] In addition, Defendant argues that if the Court does not find deliberate intent on the part of the Government, it should apply the "reckless disregard" standard that was "recognized" in *Lovasco*. *See Lovasco*, 431 U.S. at 795 n.17. However, the *Lovasco* court did not actually recognize that a person could establish a Fifth Amendment due process claim for pre-indictment delay based on a finding of recklessness. Rather, in a footnote, it mentioned that the *Government* had postulated that a due process claim might be established by applying a recklessness standard. *See id.* The *Lovasco* court did not address the merits of that argument. And "[t]he Sixth Circuit has repeatedly rejected invitations to find violations of the Due Process Clause even when a defendant suffers prejudice as a result of pre-indictment delay caused by reckless or negligent conduct." *United States v. Norris*, 501 F. Supp. 2d 1092, 1101 (S.D. Ohio 2007) (citing *Rogers*, 118 F.3d at 476; *United States v. Miller*, No. 95-5298, 1996 WL 426135, at *1 (6th Cir. July 29, 1996)). Accordingly, the

The Government disagrees that Defendant's due process rights were violated. The Government asserts that the death of CM hurts *its* case, not Defendant's. ECF No. 123, PageID.1053–54. Similarly, the Government contends that the purported unreliability of informant witnesses also hurts its case, and Defendant will have the opportunity to question their credibility upon cross-examination. *Id.* at PageID.1054. Furthermore, the Government notes that there is no evidence that pre-indictment delay caused the pole camera footage to become corrupt, and that even if it did, the missing pole camera footage does nothing for Defendant's defense. *Id.* at PageID.1055. The Government additionally asserts that Defendant's participation in the parole revocation hearing does not prejudice his defense because he only made strictly exculpatory statements. *Id.* at PageID.1054. The Government argues that its efforts to retrieve and restore evidence, along with handing over all its evidence to defense counsel, have been in good faith. *Id.* at PageID.1057. The Government reiterates that the reason for its delay in indicting Defendant was simply to conduct additional investigation. *Id.* at PageID.1054.

The Court concludes that Defendant has not satisfied either prong of the due process test for pre-indictment delay.

---

Court declines to apply a lesser "recklessness" standard to the pre-indictment delay test. The Court only addresses the arguments pertaining to the Government's purported intentional conduct.

*a. Prejudice*

Beginning with the "prejudice" prong, the Sixth Circuit has explained that the prejudice suffered by the defendant must be "substantial." *Schaffer*, 586 F.3d at 424. The prejudice that Defendant purportedly suffered fails to meet this standard.

For one, Defendant has not shown that the death of CM prejudices his defense. The Sixth Circuit has stated that:

> The death of a potential witness during the pre-indictment period may demonstrate the requisite prejudice if the defendant can demonstrate that exculpatory evidence was lost and could not be obtained through other means. However, a defendant does not show actual prejudice based on the death of a potential witness if he has not given an indication of what the witness's testimony would have been and whether the substance of the testimony was otherwise available.

*Rogers*, 118 F.3d at 475 (citing *United States v. Corbin*, 734 F.2d 643, 648 (11th Cir. 1984)) (internal citation omitted). According to Defendant, CM would have testified about what the drug ledgers meant and how Defendant directed her and another individual to run the Exeter house. ECF No. 120, PageID.988. However, "[a]lthough Defendant has provided the Court with a general description of the subjects on which the deceased witness[] would have testified, there is no mention as to how [her] testimon[y] exculpate[s] Defendant of the offenses alleged in the Indictment." *United States v. Norris*, 501 F. Supp. 2d 1092, 1097 (S.D. Ohio 2007). Indeed, as the Government argues, it would seem such testimony is *inculpatory* rather than exculpatory. Defendant laments that he cannot interview CM or cross-

examine her at trial, ECF No. 121, PageID.1033, but the mere inability to interview or cross-examine a deceased witness—particularly where, as here, Defendant has no concrete reason as to why interviewing or cross-examining CM would be helpful to his defense—is not enough under the Sixth Circuit's standards to demonstrate substantial prejudice.

In any event, Defendant has made no effort to explain why the content of CM's testimony is not available from another source. *See Norris*, 501 F. Supp. at 1098. As Defendant himself admits, CM did not work alone. Defendant has not provided the Court with any information as to why no one else could supply the same information at trial.

Next, Defendant argues that he is prejudiced because many of the witnesses in this case were addicted to drugs themselves, thereby impacting their ability to remember facts and events many years later. However, the Sixth Circuit has made clear that "loss of memory is an insufficient reason to establish prejudice." *United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003); *see also United States v. Miller*, No. 95-5298, 1996 WL 426135, at *1 (6th Cir. July 29, 1996) ("[D]imming memory alone is insufficient to establish prejudice."). Moreover, Defendant suggests that it is possible that some of these witnesses may have relapsed, passed away, or become impossible to locate, making them unavailable for trial. But just as with the death of CM, Defendant has made no effort to explain how their testimony might be

26

exculpatory or whether their testimony could be obtained from other sources. Indeed, Defendant appears only to be speculating about the possible unavailability of these witnesses, which hardly comes close to establishing substantial prejudice.

Next, Defendant claims that he is prejudiced because various evidence was lost. First, he claims that three months of pole camera footage of the Exeter house has become corrupted and unretrievable. The problem with this argument, however, is that Defendant has not described "a 'nexus between the delay and the unavailability' of the evidence." *United States v. Shafer*, 384 F. Supp. 480, 482 (N.D. Ohio 1974) (quoting *United States v. Parish*, 468 F.2d 1129, 1133 (D.C. Cir. 1972)). It is not clear when the footage became corrupted; indeed, it is not clear that the footage was *ever* usable. Without any reason to link the "destruction [of the pole camera footage]… to the delay," the Court cannot conclude that the delay prejudiced Defendant's defense. *Id.* at 482–83.

Regardless, to make the requisite showing of prejudice, Defendant must demonstrate "that the evidence lost would be both material and favorable to the defense[.]" *United States v. Vaughn*, 444 F. App'x 875, 879 (6th Cir. 2011). While the pole camera footage was likely material, Defendant has not explained why this footage would possibly be favorable to his defense. To be sure, Defendant states that he could have used this evidence as an "objective check" on the Government's per-day extrapolation regarding drug quantities sold. ECF No. 121, PageID.1033. But

he "fails to show that such testing would prove favorable." *Vaughn*, 444 F. App'x at 879.

Defendant's arguments pertaining to the other evidence supposedly lost or degraded are even more speculative. Defendant believes that it is possible that certain pole camera evidence might be lost because the Government's internal hard drive has 864 gigabytes of unused space. Defendant also questions whether pole camera evidence may have degraded through multiple conversions of the data. But these concerns are hypothetical and far from the "concrete prejudice" required to prevail on a due process claim. *Harvel*, 115 F.4th at 728. Moreover, Defendant has not linked any tangible loss or degradation of evidence to the delay, nor has he explained how any such lost or degraded evidence would have been material or favorable to his defense.

Finally, Defendant suggests that he has been prejudiced because the Government may use his parole revocation proceedings against him. But as the Government points out, Defendant's testimony at the parole revocation proceedings was strictly exculpatory. *See* ECF No. 123-6. Moreover, Brzezinski testified at Defendant's parole revocation proceedings regarding his investigation of Defendant, and he presumably will testify at Defendant's trial about the same subject. In other words, Defendant's defense has not been substantially prejudiced because the same information from the same witness is involved in both proceedings.

Accordingly, Defendant has not suffered substantial prejudice.

### b. Bad Faith

"The due process rights of the defendant are not violated in the absence of bad faith on the part of the prosecution." *Norris*, 501 F. Supp. 2d at 1099. To show bad faith, a defendant must establish that "the delay arose from some illicit attempt to gain a tactical advantage." *Harvel*, 115 F.4th at 729. Moreover, "a defendant's Fifth Amendment due process rights are generally not implicated where the government offers a valid reason for the delay." *Brown*, 959 F.2d at 66. Defendant fails to demonstrate bad faith on the part of the Government.

Defendant asks the Court to impute bad faith onto the Government because the Government began indicting other members of the Backstreets gang in 2018 and 2019, while he was not indicted until 2022. This argument fails, however, because the Supreme Court has squarely rejected any notion that pre-indictment delays are a deprivation of due process when they are caused by the Government continuing its investigation. *See Lovasco*, 431 U.S. at 796. In this case, the Government has repeatedly asserted that it did not indict Defendant along with the other Backstreets members because it decided to conduct "additional investigation into [Defendant's] multi-year drug trafficking conspiracy and overdose deaths between May 2019 and October 2022," which was partially hindered by the COVID-19 pandemic. ECF No. 123, PageID.1054; *see also* ECF No. 71, PageID.604; ECF No. 77, PageID.660–61.

29

Although the Government has not supported these claims with evidence, "both the Supreme Court and [the Sixth Circuit] have accepted similar lawyer representations in this context" because "the defendant bears the burden of proof on this challenge." *Harvel*, 115 F.4th at 728 (citing *Lovasco*, 431 U.S. at 796); *see also Rogers*, 118 F.3d at 476. Given that the overdose deaths had just recently occurred when Defendant's Backstreets compatriots were being indicted, and that Defendant was thought to be a "top dog" in the Backstreets gang, the Court does not question the Government's decision to continue its individual investigation of Defendant despite choosing to indict other gang members. The Government's continued investigation is a valid reason for the delay.

Defendant also suggests that the Government had bad faith because it wanted to use Defendant's parole violation proceedings against him in an eventual trial. However, "[t]here are no grounds for assuming that the prosecution believed that disposition of the state charges would in some sense ease its burden of proving" the crimes charged in Defendant's federal indictment. *Brown*, 959 F.2d at 67. The crimes that Defendant is currently charged with are greatly expanded from his parole violations. Defendant's parole violations mostly involve simple possession (aside from count 10 for distribution of heroin, for which Defendant was adjudicated "not guilty."). ECF No. 123-6, PageID.1067. In this case, however, Defendant is charged with conspiracy to possess and to distribute narcotics; distribution of narcotics

30

resulting in death; maintaining a drug premises; and unlawful use of a communication facility. Moreover, the burden of proof in the instant criminal case—beyond all reasonable doubt—is far greater than at Defendant's parole violation hearing, which was merely a preponderance of the evidence. *See* Mich. Comp. Laws § 791.240a(9). Given these striking differences between the proceedings, there is little reason to impute a bad faith motive onto the Government.

Defendant also claims that the Government "used a false representation to secure [Defendant's] detention through a state administrative process that gave him none of the constitutional protections of a federal arrest[.]" ECF No. 121, PageID.1034. Specifically, Defendant points to MDOC's parole report for Defendant, which stated that there was a "pending federal indictment for drug charges currently being reviewed for approval at the United States Attorney's Office"—when in fact an indictment was not issued until three years later. ECF No. 120-7, PageID.1005. According to Defendant, this must mean that the FBI lied about the status of the indictment.

The Court will not assume that this off-hand statement indicates that the FBI made false representations to MDOC. At the evidentiary hearing, Brzezinski explained that he had simply told Morant that he "*hop[ed]* to get charges filed through the U.S. Attorney's Office" within 45 days, but that he never promised as such. ECF No. 116, PageID.955. Moreover, Brzezinski clarified that he has no

31

control over the decision to issue an indictment or warrant. *Id.* The MDOC parole report is not necessarily incorrect, but simply does not account for the intricacies and uncertainties of the process in seeking an indictment and warrant.

Accordingly, the Government did not have bad faith or cause the delay for a tactical advantage. Defendant's due process claim fails.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's amended motion for reconsideration [ECF No. 69] is **DENIED.**

**IT IS SO ORDERED.**

Dated: June 1, 2026,                                  /s/Gershwin A. Drain
                                                      GERSHWIN A. DRAIN
                                                      United States District Judge

32